UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
United States of America, for the use and benefit of
M. Frank Higgins & Co., Inc., M. Frank Higgins &
Co., Inc.

                    Plaintiffs-Counter Defendants,

                    -against-

Dobco Inc.,

                    Defendant-Third-Party Plaintiff-
                    Counter Claimant,

Liberty Mutual Insurance Company,

                    Defendant,

Merchants National Bonding, Inc.,

                    Third-Party Defendant.
-----------------------------------------------------------------X

22-cv-9599 (CS) (VR)

**OPINION AND ORDER**

**VICTORIA REZNIK, United States Magistrate Judge:**

       The parties dispute whether M. Frank Higgins & Co., Inc. (Higgins) and Merchants National Bonding, Inc. (Merchants) may shield from discovery: (1) documents and communications shared between them and their attorneys under the common interest doctrine; and (2) documents and communications exchanged between them and (i) Partner Engineering, (ii) J.S. Held, (iii) North S. Tarr, (iv) Niagara Research Associates, and (v) the International Masonry Institute, under the consulting expert privilege. (ECF No. 42).

       Because the Court required additional facts and information from the parties regarding the application of the common interest doctrine, the nature of Merchants' investigation, and the consulting expert privilege, the Court directed the parties to respond by letter to a series of questions proffered by the Court. (ECF Nos. 55, 65, 66, 67, 70). In November 2023, the Court heard oral argument on the parties' pending disputes. (ECF 11/16/2023 Minute Entry). The Court now addresses these issues below.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/22/2023

I.      **Higgins' and Merchants' Invocation of the Common Interest Doctrine**

Higgins and Merchants assert that their communications are subject to the common interest privilege and therefore not subject to discovery by Dobco. (ECF No. 42 at 1–2).[1] The common interest doctrine is "an extension of the attorney client privilege," *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989), and the work-product doctrine, *Smith v. Pergola 36 LLC*, No. 22-cv-4052, 2022 WL 17832506, at *7 (S.D.N.Y. Dec. 21, 2022). Thus, any document or communication potentially protected by the common interest doctrine must first satisfy the elements of the attorney-client privilege or work-product doctrine. *Smith*, 2022 WL 17832506, at *7. "[T]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Krug*, 868 F.3d 82, 86 (2d Cir. 2017). The work-product doctrine protects materials "prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A).

Under the common interest doctrine, communications voluntarily made among different parties and their attorneys (which would ordinarily waive the privilege) are not waived "where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel in the course of an ongoing common enterprise and multiple clients share a common interest about a legal matter." *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) (alterations omitted). "Parties may share a 'common legal interest' even if they are not parties in ongoing litigation." *Id.* The doctrine "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective

---

[1] All page numbers to documents filed on ECF refer to pdf pagination.

counsel." *Id.* (internal quotation marks omitted). "However, only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected." *Id.* (alterations and internal quotation marks omitted). Also, the attorney representing the communicating party need not be present when the communication is made. *Schwimmer*, 892 F.2d at 244.

The application of the common interest doctrine to the surety-principal relationship is complicated because "the surety and principal are at war and in alliance at the same time."[2] Ultimately, the interests of the surety and principal align when the surety decides to stand behind its principal. *See Granite Comput. Leasing Corp. v. Travelers Indem. Co.*, 894 F.2d 547, 551 (2d Cir. 1990) ("Under basic suretyship law, a surety's obligations cannot be more burdensome than those of its principal, and where the principal is not liable on the obligation, neither is the guarantor.") (internal quotation marks omitted); Restatement (Third) of Suretyship & Guaranty § 34 cmt. a (1996) ("The purpose of the secondary obligation is to stand behind the obligation of the principal obligor to perform the underlying obligation, thereby assuring the obligee of the performance to which it is entitled."); Fischer, *supra* note 2, at 1040 ("At some point in the surety's investigation of an obligee's claim, the surety may decide to stand behind the principal, and thus create a common interest to the extent that the surety endorses the principal's position or is subrogated to the principal's rights and claims.").

Here, Higgins and Merchants appear to seek a blanket application of the common interest doctrine so that all their communications are shielded from discovery. Although a common interest privilege may apply to *some* communications between Higgins and Merchants because of their surety relationship, it does not automatically apply to every communication exchanged

---

[2] Amy L. Fischer, *The Attorney-Client/Work Product Privileges and Surety Investigative Information: Applying Old Rules to Turn New Tricks*, 34 TORTS & INS. L.J. 1009, 1010 (1999).

3

between them at every point in time and for all purposes. Indeed, the common interest privilege does not transform an otherwise non-privileged communication, or a document prepared in the ordinary course of business, into a protected one simply because it was exchanged between a principal and its surety. *See, e.g.*, *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (noting that work product protection will be withheld from "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation"); *accord In re Grand Jury Subpoena Dated Oct. 22, 2021*, 282 F.3d 156, 161 (2d Cir. 2002) ("Broad categorical statements about the scope of the work product privilege are risky, as individual applications are highly fact specific."). Rather, as a prerequisite, Higgins and Merchants have the burden to show how the attorney-client and work-product privileges apply. *Am. Oversight v. U.S. Dep't of Just.*, 45 F.4th 579, 593 (2d Cir. 2022) ("[T]he party invoking work-product protection . . . bears the burden of demonstrating that a withheld document qualifies as such . . . ."); *Krug*, 868 F.3d at 86 ("The parties asserting [attorney-client] privilege . . . bear the burden of establishing its essential elements.") (alterations omitted).

    A. <u>Communications Subject to Attorney-Client Privilege</u>
       (Prerequisite to Common-Interest Doctrine)

The communications Higgins and Merchants each had with their own attorneys would be protected by attorney-client privilege if those communications were intended to be, and were in fact, kept confidential, and were communicated to obtain or provide legal advice. *Krug*, 868 F.3d at 86. Any communications that Higgins and Merchants seek to shield on this basis must be logged on their privilege logs. The Court separately addresses whether attorney-client privileged documents shared *between* Higgins and Merchants would continue to be privileged under the common interest doctrine in Section C below.

4

### B. Documents Subject to Work-Product Doctrine
    (Prerequisite to Common-Interest Doctrine)

For documents created by Higgins and Merchants to be protected under the work-product doctrine, those documents must have been "prepared *in anticipation of litigation*" and not "in the ordinary course of business." *Adlman*, 134 F.3d at 1199, 1202 (emphasis added); Fed. R. Civ. P. 26(b)(3)(A).  Thus, the Court must first determine when Higgins and Merchants reasonably anticipated litigation.

Between April 13, 2021, and February 6, 2023, Dobco sent Higgins at least ten notices of default.  (*See* ECF Nos. 65 at 2–5 (identifying ten notices of default and six "additional notices"); 66 at 2–4 (identifying 14 notices of default).  While Merchants was not copied on the initial default notice, sent on April 13, 2021 (*see* ECF No. 70-1 at 3–4), Merchants learned of that default notice on August 9, 2021, in a letter Dobco sent to Higgins that copied Merchants.[3]  On August 13, 2021, Merchants responded to Dobco's August 9 letter, stating that Dobco's "allegation of default is respectfully denied."  (ECF No. 70-17 at 2).  Then, on October 8 and 26, 2021, Dobco sent Higgins two additional notices of default, with increasingly adversarial language.  (ECF No. 70-2 at 3–5, 63–67).  At least 16 more letters followed, all of which copied outside counsel.[4]  Those letters led to Dobco's notice of "principal default" on April 27, 2022, in which Dobco stated that "[t]his correspondence shall serve as Dobco's formal declaration, pursuant to paragraph 3 of the Bond, of a Principal Default and demand, pursuant to paragraph 4 of the Bond, from prompt action by Merchants."  (ECF No. 70-10 at 3).

---

[3] At oral argument, counsel for Higgins and Merchants provided a copy of the August 9, 2021, letter.  Higgins and Merchants are directed to file a copy of the letter on ECF.

[4] *See* ECF Nos. 70-2 at 85–88, 108–16; 70-3 at 3–5, 7–11; 70-4 at 3–5, 12–16; 70-5 at 3–6, 8–11; 70-6 at 3–7, 14–19, 21–25; 70-7 at 3–8, 10–14; 70-8 at 3–13, 15–22; 70-9 at 3–7, 9–12.

Higgins and Merchants argue that they reasonably anticipated litigation either on April 13, when Higgins received the April 13 default notice (ECF No. 42 at 2), or on August 13, when Merchants denied Dobco's allegation of default (ECF No. 66 at 4–6). Dobco instead argues that litigation was not reasonably anticipated until April 27, 2022, when it sent its notice of principal default. (ECF No. 67 at 1–2). According to Dobco, it was not until that April 2022 notice that Merchants was officially required to deny Dobco's claim for performance under the Subcontract. (*Id.*).

On the one hand, the dates proposed by Higgins and Merchants (in April and August, 2021) seem too early. While Dobco's April 13 notice included a boilerplate reservation of rights under the Subcontract, including termination (ECF No. 70-1 at 3–4), the focus of the letter was on getting Higgins to correct certain deficiencies and complete its work more quickly. To that end, Dobco requested "a recovery schedule, increased manpower and a meeting" with Higgins onsite immediately. (*Id.* at 3). In response, Higgins' letter took "issue" with that default notice, but otherwise emphasized amicably resolving the issues Dobco had raised. (ECF No. 70-1 at 6–7).[5] The parties' correspondence in August 2021 plays out much the same. They continued to lob similar threats and accusations at one another, including Merchants denying Dobco's allegation of default. (ECF No. 17-17 at 2–3). But Dobco also wrote that it intended to release payment to Higgins that had previously been withheld. (Aug. 9 Ltr., *supra* note 3, at 3). And later correspondence indicates that after these letters, the parties had reached some interim resolution in which Higgins had committed to completing its work no later than September 30, 2021. (ECF 70-2 at 4).

---

[5] For example, Higgins explained what it believed was the cause for the delays; apologized for failing to ask for more time to complete the project; and stressed that "[t]he focus is to move forward on this project to successful completion," as Higgins "pride[s]" itself "in being a responsible team player." (*Id.* at 6).

6

On the other hand, the April 2022 date proposed by Dobco—when it declared a "principal default"—seems too late. (ECF No. 70-10 at 3–8). By that late date, Dobco (a) had sent Higgins about ten default notices, (b) was repeatedly threatening termination of the subcontract, (c) was withholding sums of money from Higgins to offset its alleged damages, and (d) was expressing intent to hold Higgins liable.[6] Also, by mid-November 2021, Dobco and Higgins had retained outside counsel, who were communicating with each other by email. (*See* ECF No. 70-2 at 118–22). Thus, the relationship between Higgins and Dobco had broken down well before April 27, 2022, and by that time Higgins had long anticipated litigation.

Ultimately, the Court recognizes that picking a date when the parties reasonably anticipated litigation along the trajectory of their increasingly adversarial relationship is difficult. Dobco certainly took an aggressive stance in its correspondence with Higgins and Merchants early on. But to some extent, the Court recognizes that posturing between parties (including default notices and notices to cure) may be business as usual in the world of large construction projects such as this. In any event, based on the parties' actions and the changing tenor of their correspondence, the Court finds that Higgins and Merchants reasonably anticipated litigation by October 2021.

Several facts lead the Court to this conclusion. First, it appears that the parties had reached some sort of interim resolution at least until the end of September 2021, when Higgins committed to completing certain work. (ECF 70-2 at 4). Second, the tenor of Dobco's October 8 and 26, 2021 letters reveal an increasingly adversarial tone and a complete breakdown in the parties' relationship. In the October 8 letter, Dobco again threatened to terminate the Subcontract due to Higgins alleged performance failures and informed Higgins that it would

---

[6] *See* ECF Nos. 70-2 at 3–5, 63–67; 70-3 at 3–5; 70-4 at 3–5; 70-5 at 3–6; 70-6 at 3–7; 70-7 at 3–8; 70-8 at 3–13; 70-9 at 3–7.

7

deduct costs, damages, and attorneys' fees from the unpaid balance of the subcontract.  (ECF No. 70-2 at 4).[7]  Similarly, the October 26 notice contained heated language that accused Higgins of "provid[ing] self-serving correspondence that attempt[ed] to shift liability for Higgins' actions/inactions to others."  (*Id.* at 64).  Dobco also wrote that it would again start withholding money from Higgins to offset its costs, damages, and attorneys' fees and underscored its intent to "to pursue any and all damages against Higgins."  (*Id.* at 65–66).  In response, on November 1, 2021, Higgins accused Dobco of using "strong-arm tactics" and "mak[ing] inflammatory statements and accus[ations]" that Higgins had been delaying the project and performing defective work.  (*Id.* at 85–88).

Third, soon after October 2021, the parties began communicating primarily through outside counsel, which bolsters the Court's conclusion that the parties had anticipated litigation by then.  On November 10, 2021, Dobco sent Higgins another default notice, which contained a request for "an urgent meeting with Merchants" and asked that Merchants "contact Dobco's General Counsel, Louis Uccello."  (*Id.* at 108, 115).  In attempting to coordinate a meeting, Mr. Uccello "added Dobco's outside counsel, Greg Trif of Trif & Mondungo," to the parties' email chain.  (*Id.* at 122).  Later, on November 16, 2021, Mr. Trif emailed Higgins and Merchants, to

---

[7] While Dobco may have been attempting to resolve its differences with Higgins by requesting a Zoom meeting with Higgins and Merchants in the October 8 letter (ECF No. 70-2 at 5), parties to a contract can, at the same time, attempt to resolve their disputes extrajudicially and prepare documents with an eye toward anticipated litigation.  8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2024 (3d ed. 2023) ("Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced.")  For the same reason, the parties' emails on October 13, 2021, stating that they were attempting to "establish a path forward" (ECF No. 70-2 at 7–8), and Higgins' official response, on October 19, 2021, which provided, "in good faith," a proposed recovery schedule for completion of its work (*id.* at 15–18), did not negate Higgins' anticipation of litigation by October 2021.  *See In re Sealed Case*, 29 F.3d 715, 718 (D.C. Cir. 1994) (citing Wright & Miller for the proposition that prudent parties anticipate litigation and begin preparation before a lawsuit is formally commenced); *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir. 1993) (same); *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118–19 (7th Cir. 1983) (same); *Diversified Indus. v. Meredith*, 572 F.2d 596, 604 (8th Cir. 1977) (same); *O'Gorman v. Kitchen*, No. 20-cv-1404, 2021 WL 1292907, at *5 (S.D.N.Y. Apr. 7, 2021) (same); *Bogan v. Nw. Mut. Life Ins. Co.*, 163 F.R.D. 460, 463 (S.D.N.Y. 1995) (same); *In re Leslie Fay Cos. Sec. Litig.*, 161 F.R.D. 274, 280 (S.D.N.Y. 1995).

which Higgins' outside counsel, Laurann Asklof of Shipman & Goodwin LLP, directly responded, on November 17, 2021. (*Id.* at 118–19). While the parties did continue to attempt to resolve their differences in the ensuing months, Dobco's other actions and statements by and in October 2021 were still sufficient to make Higgins reasonably anticipate litigation. *See* WRIGHT & MILLER, *supra* note 7, at § 2024; *see also* sources cited *supra* note 7.

Given the nature of "the allied and adversarial relationship between the principal and surety," Fischer, *supra* note 2, at 1010, Merchants' reasonable anticipation of litigation turns on both when Higgins reasonably anticipated litigation and when Merchants stood behind Higgins. Here, it appears that Merchants stood behind Higgins as early as August 13, 2021, when Merchants denied Dobco's allegation of default. (ECF No. 70-17 at 2). Yet because Higgins did not reasonably anticipate litigation until October 2021, Merchants also did not reasonably anticipate litigation until that date.[8]

The Court thus concludes that both Higgins and Merchants reasonably anticipated litigation by October 2021. Even so, this does not automatically mean that all documents from that date are protected by the work-product doctrine. Rather, only documents prepared *because of* their anticipation of litigation are protected under the doctrine. *Adlman*, 134 F.3d at 1202. That means, documents created in the ordinary course of business are not protected. *Id.* Thus, if Higgins and Merchants each prepared documents in or after October 2021, because of their

---

[8] The Court does not believe that Merchants' continuous investigation after October 2021, negated Merchants' reasonable anticipation of litigation by that date. Despite denying Dobco's allegation of default in August 2021, Merchants invited Dobco to submit additional information and documentation. (*See* ECF Nos. 70-2 at 119; 70-10 at 14–15; 70-17 at 2). Yet, those invitations stemmed from Dobco's onslaught of default notices, which obligated Merchants to perform a continuous investigation to determine whether Dobco could proffer information that would persuade Merchants to change its position. (ECF No. 70-10 at 14 (noting that Merchants had been "monitoring correspondence exchanged between Dobco and Higgins" over the preceding months, Merchants had been "aware of many areas of dispute between" Dobco and Higgins," and despite denying performance on the bond, "Merchants' investigation remain[ed] ongoing")). Ultimately, Merchants' decision to stand behind Higgins never did waiver, and when Dobco sent its notice of principal default, Merchants steadfastly stood behind Higgins. (*Id.*).

9

anticipation of litigation, those documents would be protected under the work-product doctrine. But documents created in the ordinary course of business in or after October 2021, would not be so protected. Any documents that Higgins and Merchants seek to shield on this basis must be logged on their privilege logs. The Court separately addresses whether work-product documents shared *between* Higgins and Merchants in or after October 2021, would continue to be protected under the common interest doctrine below.

    C.   Application of the Common-Interest Doctrine to Higgins and Merchants

As noted above, under the common interest doctrine, those communications voluntarily made among different parties and their attorneys are not waived "where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel in the course of an ongoing common enterprise." *Schaeffler*, 806 F.3d at 40 (alterations omitted). Here, the disputed issue is whether and when Higgins and Merchants shared a common interest such that any communications they shared (that would otherwise be subject to attorney-client and work-product protections) did not waive the privilege but continue to be shielded from discovery.

The Court finds that Higgins and Merchants shared a common interest, sufficient to trigger the common-interest privilege, by October 2021. Although the applicability of the common interest doctrine does not hinge on the parties' reasonable anticipation of litigation, here such anticipation illustrates when the parties' common enterprise formed, and a joint defense effort began. As discussed above, it appears that Merchants stood behind Higgins as early as August 13, 2021, when Merchants denied Dobco's allegation of default. (ECF No. 70-17 at 2). But because the parties did not reasonably anticipate litigation with Dobco until October 2021, the parties did not have reason to form a common enterprise and joint defense effort until that

date. Therefore, Higgins' and Merchants' common interest in defending themselves against Dobco aligned by October 2021, after Merchants stood behind Higgins, and they both anticipated litigation with Dobco.

Thus, any communications and documents that Higgins and Merchants shared with each other in or after October 2021—that also satisfy the requirements of attorney-client privilege or the work-product doctrine (per Sections A and B above)—are protected under the common interest doctrine. Communications and documents shared with each other before October 2021, are not so protected. Any documents that Higgins and Merchants seek to shield on this basis must be logged on their privilege logs.

## II.    Merchants' Investigatory Materials

The parties dispute whether documents that Merchants created during its investigation of Dobco's claim under the performance bond are shielded under attorney-client privilege, the work-product doctrine, or both. (ECF No. 42 at 2, 4–5).[9] The Court recognizes that there may be distinctions between an insurer and a surety when analyzing whether Merchants' investigatory materials are privileged. *See, e.g.*, *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 140 n.19 (1962) ("[S]uretyship is not insurance."). But the Court believes that the application of the work-product doctrine to an insurer is analogous to the application of the doctrine to a surety. In both the insurer and surety contexts, "it is often difficult to determine when work product protection might apply." *99 Wall Dev. Inc. v. Allied World Specialty Ins. Co.*, No. 18-cv-126, 2020 WL 2730944, at *7 (S.D.N.Y. May 26, 2020). "This is because it is routine for insurance companies to investigate claims while at the same time the potential for litigation is ever present." *Id.* Similarly, a surety has a duty to investigate claims, *see U.S. Fid. & Guar. Co. v. Braspetro Oil*

---

[9] Notably, the parties have not specifically identified which documents fall into this category or when they were created.

11

*Servs. Co.*, 369 F.3d 34, 80 (2d Cir. 2004),[10] and, at the same time, the potential for litigation exists.  *See United States v. Seaboard Sur. Co.*, 817 F.2d 956, 959 (2d Cir. 1987) ("[A] surety has the option, when its principal is default-terminated, of either coming in and completing the project or paying the government its damages, essentially the cost of completion.  A surety may, of course, also challenge the propriety of the default termination, thereby, in effect, denying liability on the bond.") (citation omitted).[11]

In the insurer context, "[g]enerally, courts in this District have found that documents created by the insurer after it has declined coverage are presumed, or at least more likely, to have been created in anticipation of litigation and to be work product, whereas documents that are part of the claim investigation process are not typically work product."  *99 Wall Dev.*, 2020 WL 2730944, at *7.  "Other courts, instead of employing that presumption, have adopted a more flexible case-by-case approach."  *Roc Nation LLC v. HCC Int'l Ins. Co.*, No. 19-cv-554, 2020 WL 1970697, at *3 (S.D.N.Y. Apr. 24, 2020) (internal quotation marks omitted).  Here, the Court will not presume that work product protections automatically apply to documents created after Merchants declined coverage.  Instead, the Court will assess the context in which Merchants' investigatory materials were created.  *See Adlman*, 134 F.3d at 1202–03; *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, No. 97-cv-6124, 2000 U.S. Dist. LEXIS 7939, at *36–44,

---

[10] *See U.S. Fid. & Guar.*, 369 F.3d at 80 (noting that a surety "arguably had a duty to protect [its] own interests . . . by investigating" a project following notice that the principal had defaulted); *see also Int'l Fid. Ins. Co. v. Aulson Co.*, No. 11-cv-9240, 2012 WL 6021130, at *7 n.4 (S.D.N.Y. Dec. 4, 2012) (referring to "a surety's duty to reasonably investigate claims brought against its principal by a third-party"); AIA Risk Management, *Performance Bonds and Sureties—Infrequent Troubles*, AM. INST. OF ARCHITECTS (Dec. 14, 2020), https://www.aia.org/articles/6356995-performance-bonds-and-sureties--infrequent (discussing the surety's investigation/due diligence review).

[11] *See also Granite Comput. Leasing Corp.*, 894 F.2d at 551 ("Under a performance and completion bond, a surety generally has two options upon its principal's default.  First, the surety may undertake to complete the principal's work itself; this obligation may be satisfied by the surety funding the principal to complete its work.  Second, the surety has the option of paying the obligee under the bond its damages, essentially the obligee's cost of completion.") (citations omitted); *U.S. Fid. & Guar.*, 369 F.3d at 66 (same).

12

*34 n.7 (S.D.N.Y. June 7, 2000) (assessing the facts where a surety invoked the work-product doctrine as to documents prepared by a surety during its investigation).

Here, the Court finds that Merchants' investigatory documents, created in or after October 2021, were likely created because of Merchants' anticipation of litigation, and not in the ordinary course of its business. The facts supporting this conclusion are as follows. First, as explained above, by October 2021, Merchants both stood behind Higgins by denying the default allegations asserted by Dobco and reasonably anticipated litigation with Dobco. Second, as Merchants explains, its "investigation differed from those it performs in the ordinary course of its business because Dobco served over a dozen separate default notices related to Higgins' performance." (ECF No. 66 at 6). As the Court noted above, those default notices contained increasingly adversarial language and led to involvement of outside counsel soon after October 2021. And third, coupled with these numerous default notices, Dobco withheld "nearly $5 Million Dollars from Higgins forcing Higgins to finance completion of the project." (ECF No. 66 at 6).

Thus, given Merchants' decision to stand behind Higgins as early as August 2021 coupled with the adversarial tenor of the parties' actions and correspondence in October 2021, the Court finds that Merchants' investigatory materials created *in or after October 2021*, are presumptively protected by the work-product doctrine. If these materials were shared with Higgins in or after October 2021, then they fall within the ambit of the common-interest doctrine and continue to be privileged.

But if any of Merchants' investigatory materials (regardless of their creation date) satisfy the elements of attorney-client privilege and are not subject to waiver, then such materials would

13

be shielded under the attorney-client privilege. And if these materials were shared with Higgins in or after October 2021, then they continue to be privileged under the common-interest doctrine.

Any investigatory documents and communications Merchants seeks to shield under the attorney-client privilege or work-product doctrine must be logged on their privilege log.

### III. Higgins' and Merchants' Invocation of the Consulting Expert Privilege

Higgins and Merchants assert that documents and communications exchanged between them and various consulting experts are privileged and not subject to discovery. (ECF No. 42 at 2–3). Under Fed. R. Civ. P. 26(b)(4)(D), "[o]rdinarily, a party may not . . . discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." "The rule is intended to allow litigants to consult experts in order to evaluate a claim without fear that every consultation with an expert may yield grist for the adversary's mill." *Agron v. Trs. of Columbia Univ.*, 176 F.R.D. 445, 449 (S.D.N.Y. 1997) (internal quotation marks omitted). "In determining whether an expert was hired in anticipation of litigation, the court must examine the total factual situation in the particular case. To conclude that an expert was hired in anticipation of litigation, a lawsuit need not have been filed, but there must have existed more than a remote possibility of litigation." *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 175 F. R.D. 34, 43 (S.D.N.Y. 1997) (citation and internal quotation marks omitted).

As with the common interest privilege, it appears that Higgins and Merchants seek a blanket ruling that all documents and communications exchanged between them and various consulting experts are privileged and not subject to discovery. As explained below, the Court concludes that the consulting expert privilege is applicable to only some of these experts. The Court agrees with Dobco that Higgins and Merchants cannot conceal prior communications with

14

professionals engaged in the ordinary course of business by transforming them into non-testifying experts. Instead, the Court must examine the particular facts to determine whether the experts were retained or specially employed in anticipation of litigation.

      A.  <u>Partner Engineering and J.S. Held</u>

Here, the Court finds that documents and communications exchanged between Higgins and Partner Engineering and between Merchants and J.S. Held are protected under the consulting expert privilege. Higgins explains that it retained Partner Engineering in October 2021, after Higgins had received Dobco's October 8 default notice. (ECF No. 66 at 7). Higgins retained Partner Engineering "to serve as an expert consultant to perform certain consulting services related to a review and analysis of the deficient work issues asserted by Dobco as a basis for declaring a default under the subcontract." (*Id.*). Because Higgins retained Partner Engineering in response to receiving Dobco's October 8 default notice, Higgins retained Partner Engineering in anticipation of litigation. Thus, documents and communications exchanged between Higgins and Partner Engineering fall within the ambit of the consulting expert privilege, unless Higgins later discloses Partner Engineering as a testifying expert.

Similarly, Merchants explains that it retained J.S. Held in January 2022 "to assist Merchants in performing its investigation and to understand the status of the work in place, the scope of work remaining under Higgins' subcontract, and to assess the quality of workmanship issues which Dobco believed existed in Higgins' work in place, and which were the basis for Dobco's declarations of default under the subcontract." (*Id.* at 8). As explained above, by January 2022, Merchants had anticipated litigation and had stood behind Higgins. During that time, Merchants was also still engaged in its ongoing investigation of Dobco's repeated default notices. Because Merchants reasonably anticipated litigation and then retained J.S. Held to

investigate the issues that were the basis for Dobco's declarations of default, the documents and communications exchanged between Merchants and J.S. Held fall within the ambit of the consulting expert privilege, unless Merchants later discloses J.S. Held as a testifying expert.

B. International Masonry Institute

Rule 26(b)(4)(D) only applies to experts who have been "*retained* or *specifically employed*." Fed. R. Civ. P. 26(b)(4)(D) (emphasis added). As the 1970 Advisory Committee Note explains, Rule 26(b)(4)(D) "is concerned only with experts retained or specially consulted in relation to trial preparation. Thus the subdivision *precludes* discovery against experts who were informally consulted in preparation for trial, but not retained or specially employed." Fed. R. Civ. P. 26, 1970 Advisory Committee Note (emphasis added). "[T]his preclusion not only encompasses information and opinions developed in anticipation of litigation, but also insulates discovery of the identity and other collateral information concerning experts consulted informally." *Ager v. Jane C. Stormont Hosp. & Training Sch. for Nurses*, 622 F.2d 496, 501 (10th Cir. 1980); *accord USM Corp v. Am. Aerosols, Inc.*, 631 F.2d 420, 424–25 (6th Cir. 1980) ("Since discovery of expert information acquired in anticipation of litigation can only be had in accordance with Rule 26(b)(4), if no provision is made for experts consulted informally in anticipation of litigation, no discovery concerning them is permissible.").[12]

Here, Higgins neither retained nor specifically employed the International Masonry Institute. Rather, Higgins "asked the International Masonry Institute to visit the project site and

---

[12] *See also Brousseau v. Postmaster Gen.*, 209 F.R.D. 293, 295 (D. Conn. 2002); *J. T. Eaton & Co. v. Atl. Paste & Glue Co.*, No. 84-cv-4438, 1987 WL 17084, at *4 (E.D.N.Y. Aug. 31, 1987) ("Experts who were informally consulted in preparation of trial but not retained or specially employed are not subject to discovery.") (emphasis and internal quotation marks omitted); *Baki v. B. F. Diamond Constr. Co.*, 71 F.R.D. 179, 182 (D. Md. 1976) ("If they were merely consulted informally, but not retained or employed, in the absence of most unusual circumstances, they would not have any information or knowledge concerning a specific case at hand which would be discoverable. Such information as they would have would be that which generally could be possessed by any expert in their respective field. To allow discovery of the identity of such persons merely consulted informally would be to interfere unduly with and hamper pretrial preparation and investigation.").

16

observe work performed by the masons" and Higgins requested "guidance with respect to certain issues." (ECF No. 66 at 8). But the International Masonry Institute was neither formally retained nor compensated for their analysis. (*Id.*). Thus, the International Masonry Institute was not a consulting expert under Rule 26(b)(4)(D). Rather, the International Masonry Institute was a non-discoverable, informal consultant. Fed. R. Civ. P. 26, 1970 Advisory Committee Note. Dobco is therefore not entitled to discover information from the International Masonry Institute. *Id.*; *Ager*, 622 F.2d at 501; *USM Corp.*, 631 F.2d at 424–25.

C. North S. Tarr and Niagara Research Associates

The consulting expert privilege does not apply to North S. Tarr and Niagara Research Associates because Higgins provided their reports to Dobco. The purpose of the consulting expert privilege is "to allow litigants to consult experts in order to evaluate a claim without fear that every consultation with an expert may yield grist for the adversary's mill." *Agron*, 176 F.R.D. at 449. Thus, "the interest in allowing counsel to obtain expert advice without fear of potentially benefitting their adversary" is not implicated where, as here, "the expert's report has already been written and served" on the opposing party. *Anderson v. Metro-North Commuter R.R.*, No. 14-cv-452, 2016 WL 2755910, at *3 (D. Conn. May 11, 2016).

Here, Higgins provided North S. Tarr's report to Dobco on March 10, 2022, and provided Niagara Research Associates' report to Dobco on June 27, 2022. (ECF No. 66 at 8). By voluntarily providing these two reports to Dobco, Higgins "voluntarily waived the only relief that Rule 26(b)(4)(B) provides—the non-disclosure of expert discovery for a non-testifying expert." *Agron*, 176 F.R.D. at 449. Accordingly, the reports prepared by North S. Tarr and Niagara Research Associates are not shielded from discovery under the consulting expert privilege.

## CONCLUSION

For these reasons, the Court finds that the common interest doctrine shields communications made during or after October 2021, between Higgins and Merchants and their attorneys, if those communications were intended to be, and were in fact, kept confidential, and were communicated to obtain or provide legal advice. The common interest doctrine also shields documents prepared in or after October 2021, and shared between Higgins and Merchants and their attorneys, if those documents were prepared *because of* Higgins' and Merchants' anticipation of litigation. Any documents and communications that Higgins and Merchants shield from discovery based on the common interest doctrine must be logged on their privilege log(s).

As for Merchants' investigatory materials, if such materials were created in or after October 2021, then the materials are presumptively protected under the work-product doctrine. If such materials were shared with Higgins in or after October 2021, then they continue to be privileged under the common-interest doctrine. Any investigatory materials (regardless of their creation date) that satisfy the elements of attorney-client privilege and are not subject to waiver, are also shielded under attorney-client privilege. And if such materials were shared with Higgins in or after October 2021, then they are protected under the common-interest doctrine. Any documents and communications Merchants seeks to shield on these bases must be logged on their privilege log.

As for the application of the consulting expert privilege, documents and communications exchanged between Higgins and Partner Engineering are protected under the consulting expert privilege. Documents and communications exchanged between Merchants and J.S. Held are protected under the consulting expert privilege. The International Masonry Institute is not a

consulting expert, but Dobco may not seek any discovery from them.  Finally, Higgins and Merchants waived any consulting expert privilege over North S. Tarr and Niagara Research Associates by voluntarily providing their reports to Dobco.

It is hereby **ORDERED** that the stay of discovery (*see* ECF No. 57), is lifted.  The parties are directed to meet and confer and to submit to the Court, by no later than **January 12, 2024**, a proposed revised Civil Case Discovery Plan and Scheduling Order, setting forth the deadlines to complete the rest of discovery.

Finally, the Clerk of Court is respectfully directed to terminate any pending motions at ECF Nos. 42, 65, 66, 67, 70.

    **SO ORDERED.**

DATED:     White Plains, New York
               December 22, 2023

                                               _____
                                               VICTORIA REZNIK
                                               United States Magistrate Judge